# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

RUSSELL VAUGHN,         )
      Plaintiff,         )
                         )       Civil Action No. 2:06-00094
v.                        )       Judge Nixon/Brown
                         )
MICHAEL J. ASTRUE,       )
Commissioner of Social Security,  )
      Defendant.        )

To:    The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) and 1383 (c)(3)  to obtain

judicial review of the final decision of the Commissioner of Social Security denying plaintiff

disability insurance benefits (DIB) and supplemental security income (SSI), as provided under

Titles II and XVI of the Social Security Act (Act) as amended.  The case is currently pending on

plaintiff's motion for judgment on the administrative record.  (Docket Entry No. 14).  For the

reasons stated below, the Magistrate Judge recommends that Plaintiff's Motion for Judgment on

the Administrative Record be GRANTED, and that the decision of the Commissioner be

REVERSED. The Magistrate Judge recommends that this case be remanded to the Secretary for

an award of benefits.

## I.  INTRODUCTION

Plaintiff filed his applications for Supplemental Security Income (SSI)  and for Disability

Insurance Benefits (DIB) on February 8, 2001, alleging that he became disabled on January 15,

2001, due to numerous ailments, including liver and esophagus problems, cirrhosis, stomach and

1

back pain, arthritis, gout, acid reflux, high cholesterol, nerves, and blindness in the right eye. (Tr. 33-34, 78-80, 208, l.283-285). Plaintiff's claim was denied initially and upon reconsideration (Tr. 54-62, 286-296). At Plaintiff's request, an administrative law judge (ALJ) conducted a hearing on December 3, 2002. (Tr. 67). Plaintiff, who was represented by counsel, and Kenneth Anchor, a vocational expert, testified. (Tr. 31-53). On February 5, 2003, the ALJ issued a written decision, denying Plaintiff's claims for DIB and SSI. (Tr. 18-24). Plaintiff requested that the Appeals Council (AC) review the ALJ's decision and on August 13, 2004, the AC denied this request. (Tr. 6-9, 13). Plaintiff appealed that decision to this Court, and, on May 10, 2005, this Court remanded the case back to the Commission for further administrative proceedings. (Tr. 358-361). On February 1, 2006, another hearing was held before an ALJ where Plaintiff, who was again represented by counsel, and JoAnn Bullard, a vocational expert, testified. (Tr. 504-530). On June 13, 2006, the ALJ issued a written decision, again denying Plaintiff's claims for DIB and SSI. (Tr. 343-351). The ALJ made the following findings:

1.    The claimant met the insured status requirements of the Social Security Act through December 31, 2005.

2.    The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.)

3.    The claimant has the following severe impairments: right eye blindness; Barrett's esophagus; hepatitis; hypertension; spinal; osteoarthritis; status post umbilical hernia; right hip; respiratory; gout; and anxiety. (20 CFR 404.1520 and 416.920).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the record, the undersigned finds that the claimant has the residual functional capacity to perform light work. The claimant has significant nonexertional impairments which would preclude him from any work requiring

2

binocular vision, excessive vibration, frequent bending and stooping, frequent squatting, and more than poor reading ability.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 25, 1960 and was 40 years old on the alleged disability onset date, which is defined as a younger individual (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of jobs skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560, 404.1566, 416.960 and 416.966).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from January 15, 2001 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 343-351)

On June 21, 2006, Plaintiff requested that the AC review the ALJ's decision and on September 12, 2006, the AC denied this request. (Tr. 329-332). This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g) and 1383 (c)(3). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

A.    Background and Medical History

Plaintiff was born on June 25, 1960, and has an eighth grade education. (Tr. 100, 507).

1.    *Right Eye Blindness*

3

Plaintiff was diagnosed with a detached retina in 1994 and underwent operations on his right eye in 1994 and 1995, leaving him with only light perception in his right eye as well as depth perception difficulties. (Tr. 138-139, 151-163, 184-185). Dr. James Miller, an optometrist, examined Plaintiff several times between 2001 and 2004, noting that vision in the right eye was light perception only, vision in the left eye was 20/20 with corrective lenses and 20/30 without corrective lenses, and that safety glasses should be worn at all times. (Tr. 154, 238, 441). In January 2005, Dr. Marvin Blevins performed a consultative examination. (Tr. 442). Dr. Blevins' opined that Plaintiff had right eye vision of less than 20/200 with glasses, left eye vision of 20/40 with glasses, and both with 20/40. (Tr. 446).

2.  *Gastrointestinal Problems and Liver Disease*

In November 1999, after complaints of epigastric pain and heartburn, Plaintiff was treated by Dr. Ira E. Stein, a gastroenterologist. (Tr. 164-165). Dr. Stein prescribed Prilosec after noting fatty liver infiltrates, heartburn, Barrett's mucosa in the distal esophagus, a hiatal hernia, inflammation in the antrum, and mild chronic gastritis. (Tr. 164-165, 168). From May 10, 1999-January 25, 2001, Plaintiff was treated by Dr. Gray Smith. (Tr. 172-174). Throughout this time, Dr. Smith noted Plaintiff's heartburn and related gastrointestinal problems were improved by medication, mainly Prilosec. (Tr. 174-176). Additionally, it appears that Plaintiff initially reported to Dr. Smith that he drank a six pack of beer on the weekends and smoked on a regular basis. (Tr. 174-176). Plaintiff then reported to Dr. Smith that he drank a six pack every two days. (Tr. 171). Dr. Smith advised Plaintiff to stop drinking and smoking in order to avoid progression of his Barrett's esophagus to esophogeal cancer. (Tr. 172-174). In June 2001, Plaintiff was treated by Dr. Joyce Bremer, another gastroenterologist who confirmed Plaintiff's Barrett's esophagus, who also

4

recommended that plaintiff stop drinking alcohol when Plaintiff reported that he drank 10-12 beers weekly (Tr. 208-209). In July 2001, Dr. Trueman Smith, Plaintiff's primary treating physician, also noted that Plaintiff refused to discontinue his alcohol consumption "in spite of his specialist advising him to do so and as I did again today." (Tr. 232).

In April 2001, Dr. Trueman Smith began treating Plaintiff for his liver issues. (Tr. 197). Dr. Smith concluded Plaintiff suffered from liver failure, gout and noctural myoclonus. (Tr. 197). Dr. Smith also found that Plaintiff's liver enzymes were elevated (SGOT of 283 and SGPT of 364). (Tr. 196). In May 2001, Dr. Smith tests subsequently revealed that Plaintiff's elevated liver enzymes had decreased but remained at an elevated level (SGOT of 66 and SGPT of 125). (Tr. 196).

In October 2001, Plaintiff's liver enzymes were borderline (SGOT of 38 and SGPT of 71). (Tr. 229). In December 2002, Dr. Smith noted that Plaintiff's elevated liver enzymes had been "more or less stable of late." (Tr. 478). In May and June 2003, Dr. Smith noted that Plaintiff had chronic elevation in his liver enzymes. (Tr. 473-474). In October 2003, Plaintiff underwent repair of an umbilical hernia without incident (Tr. 438, 471). In November 2003, Dr. Smith noted that Plaintiff's gastritis symptoms were well-controlled. (Tr. 256). In April 2005, Plaintiff presented with complaints of chest pain, which was diagnosed as gastroesophageal reflux disease (GERD). (Tr. 463). In February 2005, Dr. Smith noted that he continued to monitor Plaintiff's liver enzymes which had been elevated in the past. (Tr. 465).

3.    *Gout*

Plaintiff has a history of gout with episodes that appear to respond to treatment. (Tr. 172, 225, 228, 232, 249). In June 2001, Plaintiff presented to Dr. Trueman Smith for gout treatment. (Tr.

5

232). Dr. Smith noted that Plaintiff had several gout episodes in the past few months. (Tr. 232). In November 2001, Dr. Smith treated the Plaintiff for a gout reoccurrence in Plaintiff's right foot. (Tr. 228). In February 2002, Plaintiff reported to Dr. Smith that he continued to have a lot of discomfort and arthritic type symptoms and gout type symptoms at times in his feet, ankles, hips and knees. (Tr. 251). In June 2002, Dr. Smith noted Plaintiff continued to take his gout medications and had no new flare-ups since February 2002. (Tr. 253). In December 2003 and in April 2004, Dr. Smith noted that Plaintiff's gout was well controlled and Plaintiff had no gout flare-ups of late due to his medication regimen. (Tr. 469-470). In January 2005, Plaintiff had a gout episode in his right great toe. (Tr. 466). Plaintiff responded well to medications. (Tr. 466). In February 2005, Plaintiff reported that his gout was doing well. (Tr. 465).

4. *Hypertension*, *Back Pain and Osteoarthritis*

In May 2001, Dr. Trueman Smith treated Plaintiff for lower back pain. (Tr. 196). Dr. Smith noted a slightly decreased range of motion and minimal tenderness. (Tr. 197). X-rays revealed minimal degenerative changes throughout the lumbar spine and Dr. Smith then prescribed Vioxx. (Tr. 196). In June 2001, because the Vioxx was ineffective, Dr. Smith prescribed Norco. (Tr. 196).

In July 2001, Plaintiff's blood pressure was elevated at 172/104 and Dr. Smith reported that Plaintiff had decided to stop taking one of his hypertensive medications because it caused blurred vision and made him feel unwell. (Tr. 231). In August 2001, Dr. Smith noted that Plaintiff's x-rays demonstrated arthritis and Plaintiff's pain medication was changed to Celebrex. (Tr. 247). In September 2001, Dr. Smith noted that Celebrex was ineffective and switched Plaintiff to Vicodin. (Tr. 248). In October 2001, Plaintiff indicated that he was still having lower back pain, and Dr. Smith continued to treat Plaintiff's pain with Vicodin. (Tr. 248). At that time, Dr. Smith also

6

increased Plaintiff's medications for treatment of hypertension as Plaintiff's blood pressure remained high. (Tr. 228). In November 2001, Dr. Smith noted that Plaintiff continued to be hypertensive with his blood pressure at 152/102. (Tr. 249). Further, Dr. Smith continued to treat Plaintiff's lower back pain with Vicodin. (Tr. 249).

In February 2002, Plaintiff's blood pressure continued to be elevated at 160/104 and Tiazac was added to his hypertension medications. (Tr. 251). Plaintiff continued to report discomfort for arthritic type pain and reported that he used Vicodin once or twice per day. (Tr. 251). Dr. Smith refilled Plaintiff's Vicodin prescription. (Tr. 251). Also in February 2002, spinal x-rays continued to show very mild degenerative changes at the L1-L2 level and more severe disease at T11-T12. (Tr. 274).

In March 2002, Dr. Smith increased the Tiazac dosage because Plaintiff's still had high blood pressure at 158/106. (Tr. 251). In April 2002, Plaintiff's blood pressure was described as "superb" at 138/76 and Dr. Smith continued to treat Plaintiff's lower back pain with Vicodin. (Tr. 252). In June 2002, Dr. Smith noted that Plaintiff continued to be very hypertensive at 190/110 and increased his medications. (Tr. 252). Dr. Smith also refilled Plaintiff's Vicodin prescription as continued treatment for Plaintiff's low back pain and discomfort in his neck and shoulders. (Tr. 252). At that time, Plaintiff reported that he used Vicodin from time to time for pain control. (Tr. 253). In July 2002, Plaintiff's blood pressure was reported as "excellent" at 132/82. (Tr. 253). Dr. Smith also noted a decreased range of motion in all planes, after Plaintiff reported continuing low back pain. (Tr. 253). Dr. Smith continued to treat Plaintiff's pain with Vicodin. (Tr. 253-254). In August 2002, Plaintiff's hypertension was reported as under good control on the current medications. Plaintiff reported that he was using Vicodin "on and off" for pain associated with

7

osteoarthritis in his back, hips, and knees. (Tr. 223). Dr. Smith refilled Plaintiff's Vicodin prescription. (Tr. 255).

In November 2002, Dr. Smith noted that Plaintiff continued to have osteoarthritic symptoms affecting mainly in his legs. (Tr. 256). Dr. Smith continued to treat Plaintiff's pain with Vicodin. (Tr. 256). In December 2002, Plaintiff continued to report a "good deal of discomfort in his low back, hips and knees." (Tr. 478). Dr. Smith continued Plaintiff's Vicodin treatment. (Tr. 478). At that time and in January 2003, Dr. Smith encouraged Plaintiff to quit his pack a day smoking habit to avoid complications with his ailments. (Tr. 476).

In February 2003, Dr. Smith reported that while Plaintiff continues to have low back discomfort and arthritis affecting his shoulders and knees, Vicodin continued to keep him "comfortable, active and productive." (Tr. 477). In April 2003, Dr. Smith again treated Plaintiff for hypertensive and arthritic symptoms involving his back, hips and knees. (Tr. 476). Dr. Smith refilled Plaintiff's Vicodin prescription, which Plaintiff reported he took from time to time for pain. (Tr. 476). In May 2003, Plaintiff reported to Dr. Smith that he had considerable discomfort in the low back that radiated to the hips and legs. (Tr. 474). Plaintiff indicated that any increased activity increased these symptoms. Dr. Smith found decreased range of motion in all planes with pain and stiffness in his lower back. (Tr. 474). Dr. Smith continued to prescribe Vicodin to control Plaintiff's pain. (Tr. 474). In a May 15, 2003, letter, Dr. Smith opined that Plaintiff's medical problems made him unfit for work. (Tr. 475). Specifically, Dr. Smith stated that Plaintiff suffers from significant hypertension, gout, degenerative osteoarthritis affecting his low back which causes a "good deal of discomfort" on a day-to-day basis, controlled by Vicodin. (Tr. 475).

In June and July 2003, Dr. Smith again reported that Plaintiff continued to complain of low

8

back pain. (Tr. 473). Again, Dr. Smith noted that Vicodin kept Plaintiff active and productive and enabled him to rest fairly well at night. (Tr. 473). Also in July 2003, Dr. Smith noted that Plaintiff's blood pressure was "excellent" at 130/80. (Tr. 473). In August 2003, Dr. Smith increased Plaintiff's Vicodin dosage for back pain when Plaintiff reported that the current dosage was not enough to control his pain. (Tr. 472). In September 2003, Plaintiff's blood pressure was again reported as excellent. (Tr. 472). Additionally, Dr. Smith noted again that Plaintiff had a good deal of stiffness and achiness in his lower back and the Vicodin helped to keep him active and productive. (Tr. 472).

From November 2003 through March of 2005 , Dr. Smith treated Plaintiff regularly, usually on a monthly basis. (Tr. 463-472). Dr. Smith continued to prescribed Vicodin for Plaintiff's lower back, hip and knee pain. (Tr. 463-472). During this time, Dr. Smith continued to note that Plaintiff was able to remain active and productive with the use of current medications, specifically Vicodin. (Tr. 469, 473). Also, Plaintiff's blood pressure fluctuated during this time but appeared to be controlled by medication. (Tr. 463-472).

In March 2005, Plaintiff's blood pressure was reported as 122/88. Plaintiff reported to Dr. Smith that he still had a "dull, achy type pain" in his low back and was now taking Vicodin up to three times daily. (Tr. 464). In April 2005, Dr. Smith treated Plaintiff for bronchitis. (Tr. 465). At that time, Plaintiff continued to report problems with pain in his low back, hips and knees. (Tr. 465). Dr. Smith refilled Plaintiff's prescriptions for Vicodin and Xanax. (Tr. 503).

In June 2005, Dr. Smith increased the dosage of Plaintiff's antihypertensive medication. (Tr. 503). Also in June 2005, Dr. Smith opined that Plaintiff's degenerative lumbar disc issues had remained relatively the same as they were back in July 2002. (Tr. 462). Specifically, Dr. Smith advanced that Plaintiff's "condition really has not changed any. He still has severe degenerative low

back discomfort with symptomatic pain any time he increases activity and is unemployable as a result of his back injury." (Tr. 462).

In July 2005, Dr. Smith noted that Plaintiff was not taking his hypertensive medications, as he had loss his TennCare coverage and could not afford the medications. (Tr. 500-502). Plaintiff's blood pressure was 180/106. (Tr. 502). In September 2005, Plaintiff's blood pressure was 180/110. (Tr. 501). Dr. Smith again noted that Plaintiff was not taking his medications as recommended and gave Plaintiff a three month supply of his antihypertensive medication. Dr. Smith also refilled Plaintiff's Vicodin and Xanax prescriptions. (Tr. 501).

In October 2005, Plaintiff reported that he had been checking his blood pressure at home, finding it in the 130-140/85 range. (Tr. 501). Dr. Smith noted that Plaintiff's blood pressure was 148/92. (Tr. 501). Dr. Smith again reported that Vicodin, which Plaintiff was now taking up to four times a day for back pain, kept Plaintiff active and productive, enabling him to rest at night and to "get things done he needs to get done during the day." (Tr. 501). In November 2005, Plaintiff's blood pressure increased to 152/94. (Tr. 500). At that time, Dr. Smith reported that Plaintiff had again stopped taking his medications, as Plaintiff remained uninsured. (Tr. 500). Dr. Smith again refilled Plaintiff's Vicodin and Xanax prescriptions. (Tr. 500). In January 2006, Dr. Smith reported that Plaintiff's blood pressure was at 132/82. (Tr. 499). Additionally, Dr. Smith noted that Plaintiff continued to have discomfort in his back everyday, which increased when he increased his activity. (Tr. 499). Dr. Smith again refilled Plaintiff's Vicodin and Xanax prescriptions. (Tr. 499).

B.    Medical Assessments, Reported Activities, and Vocational Expert

1.    *Medical Assessments*

In March 2001, DDS medical advisor, Lanadon B. Robbins, reviewed the record and

determined that Plaintiff retained the RFC for light exertion work. (Tr. 54, 187). In June 2001, another DDC medical advisor, Dr. Lawrence G. Schull, M.D., examined Plaintiff's record and also determined that he retained the RFC capacity for light exertion work with limited depth perception and field of vision requirements and work not requiring exposure to extreme heat or cold. (Tr. 187-190).

In July 2001, Dr. Trueman Smith, Plaintiff's treating physician, completed a medical assessment, opining that Plaintiff could occasionally lift or carry ten pounds, frequently lift or carry less than ten pounds, stand or walk for about two hours, and sit for about two hours in a workday with limited pushing and pulling. (Tr. 217). Dr. Smith also opined that the pain was frequently severe enough to interfere with attention and concentration and that Plaintiff was likely to be absent more than four times a month. (Tr. 218). Dr. Smith indicated that Plaintiff had chronic low back pain as well as left leg pain, both of which would have increased symptoms with any increase in activity. (Tr. 217-218). Dr. Smith also noted Plaintiff's problems with elevated liver enzymes, chronic heartburn, hypertension, gout and vision impairment. (Tr. 218).

In July 2002, Dr. Smith completed another medical assessment, opining that Plaintiff could occasionally lift or carry ten pounds, frequently lift or carry less than ten pounds, stand or walk for less than two hours, and sit for about four hours in a workday with limited pushing or pulling with his arms and legs and a sit/stand option. (Tr. 220-221). Dr. Smith also stated again that the pain was frequently severe enough to interfere with attention and concentration and that Plaintiff was likely to be absent more than four times a month. (Tr. 221). Dr. Smith added that Plaintiff would need to take unscheduled breaks hourly and could never do postural activities, with the exception of occasional balancing. (Tr. 221-222). Further, Dr. Smith opined that Plaintiff's reach was limited

by low back pain and Plaintiff was to avoid even moderate exposure to temperature extremes, vibration, humidity or wetness, or hazards.  (Tr. 222).

In October 2002, Dr. Bremer, one of Plaintiff's treating gastroenterologists for Plaintiff's Barrett's esophagus in June of 2001, opined that Plaintiff's ability to lift, carry, stand, walk, sit, push and pull were unaffected by his impairments.  (Tr. 240-243).  Further, Dr. Bremer stated that Plaintiff had no postural, manipulative, visual/communicative, or environmental limitations.  (Tr. 241-243).

In December 2002, Dr. Smith completed another assessment indicating that Plaintiff was limited to less than full time sedentary work, could lift 10 pounds, frequently lift less than 10 pounds, could stand less than two hours in an 8-work day, was limited in reaching in all directions due to severe back pain, and unlimited in handling, fingering and feeling.  (Tr. 244-246).  Dr. Smith further opined that Plaintiff should avoid even moderate exposure to extreme temperatures, humidity, hazards, fumes, odors, gases, and dusts.  (Tr. 245).  Dr. Smith also stated that Plaintiff could sit about four hours in an 8-hour workday, was limited in pushing or pulling due degenerative osteoarthritis in the lumbar spine, should never climb, kneel, crouch or crawl, could occasionally balance, would be required to periodically alternate between sitting and standing, would have pain often that was severe enough to interfere with attention and concentration, was capable of low stress jobs, would need to take unscheduled breaks during an 8-hour workday and would be absent from work as a result of his impairments more than four times a month.  (Tr. 246). When asked whether Plaintiff's impairments were likely to produce "good days" and "bad days,"  Dr. Smith responded that Plaintiff's impairments produce all bad days.  (Tr. 246).

In a May 15, 2003, letter, Dr. Smith opined that Plaintiff's medical problems made him unfit

12

for work. (Tr. 475). Specifically, Dr. Smith stated that Plaintiff suffers from significant hypertension, gout, degenerative osteoarthritis affecting his low back which causes a "good deal of discomfort" on a day-to-day basis, lessened by Vicodin. (Tr. 475). Dr. Smith further opined that, "Any attempt he [Plaintiff] makes to be more physical, either working around the house or around the yard, results in increasing discomfort...As a result of the patient's significant hypertension and his degenerative osteoarthritis affecting his low back coupled with his gout, he [Plaintiff] is unemployable as any increase in his activity results in a significant increase in discomfort in his low back and makes him unfit for work." (Tr. 475).

In January 2005, Dr. Melvin Blevins performed a consultative examination. (Tr. 442-448). After conducting full range of motion testing, Dr. Blevins opined that Plaintiff had reduced motion in the cervical and dorsolumbar spine and both hips. (Tr. 451-452). Spinal x-rays revealed narrowing at L5-S1 consistent with early degenerative lumbar disc disease, osteoarthritis of the lumbar spine, and acute and chronic lumbar strain. (Tr. 450). Hip x-rays showed a decrease in normal joint space and early degenerative changes in the right hip. (Tr. 450). Dr. Blevins' impressions included chronic bronchitis, osteoarthritis, degenerative lumbar disc disease, hypertension, chest pain of undetermined significance, blindness in the right eye, history of gout, obesity, anxiety, and evidence of peripheral vascular disease. (Tr. 449). Dr. Blevins opined that Plaintiff could occasionally lift less than 20 pounds, could do no frequent lifting, could stand for two hours and sit for four hours in a workday. (Tr. 449).

Also in January 2005, another DDS medical advisor, Dr. N.D. Robinson, reviewed the record and determined that Plaintiff was able to perform light work with limited reaching, handling, fingering, and feeling (Tr. 454-456). Dr. Robinson disagreed with Dr. Blevins' medical assessment,

13

stating that "Dr. Blevins MA [medical assessment] appears overly restrictive compared to the objective findings which show good musculoskeletal and neurological function." (Tr. 459). Dr. Robinson opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about 6 hours in an 8 hour workday, sit about 6 hours in an 8 hour workday, was unlimited in his ability to push and/or pull, could frequently climb, balance, stoop, kneel, crouch, and crawl, and was limited in his ability to reach in all directions, handle, finger and feel. (Tr. 454-456). Dr. Robinson also opined that Plaintiff had no visual limitations. (Tr. 456). Dr. Robinson further opined that Plaintiff had no communicative or environmental limitations except those involving hazards. (Tr. 457).

On June 9, 2005, Dr. Smith wrote a letter to Plaintiff's counsel stating that Plaintiff's degenerative lumbar disc issues were basically the same as they were in July of 2002. (Tr. 462). Dr. Smith opined that Plaintiff's "condition really has not changed any. He still has severe degenerative low back discomfort with symptomatic pain any time he increases activity and is unemployable as a result of his back injury." (Tr. 462). Dr. Smith also opined that Plaintiff has chronic hypertension which is difficult to control, elevated cholesterol and a history of liver disease which was now stable. (Tr. 462). In conclusion, Dr. Smith advanced that "...basically, his [Plaintiff's] osteoarthritic back discomfort disables him." (Tr. 462).

On January 13, 2006, Dr. Smith completed another medical assessment wherein he opined that Plaintiff could occasionally lift or carry ten pounds, frequently lift or carry less than ten pounds, stand or walk for less than two hours, and sit for about fours in a workday with a limited ability to push or pull with the arms or legs. (Tr. 494-495). Dr. Smith also opined that Plaintiff would need a sit/stand option, had pain that was frequently severe enough to interfere with attention and

14

concentration, and was now incapable of even low stress jobs. (Tr. 495). Further, Dr. Smith found

that Plaintiff would need unscheduled breaks every 30 minutes. (Tr. 495). Additionally, Dr. Smith

advanced that Plaintiff was likely to be absent more than four times a month due to his impairments,

could never do postural activities, and could do only occasional reaching. (Tr. 496). Further, Dr.

Smith opined that Plaintiff needed to avoid all exposures to temperature extremes, humidity or

wetness, and hazards. (Tr. 497).

       2.     *Plaintiff's Activities of Daily Living and Hearing Testimony*

In his February 2001 Statement of Claim, Plaintiff reported that he cooked pork chops,

beans, or fried chicken two or three times a week, grocery shopped once a week, cleaned and did

laundry, and drove to visit his mother. (Tr. 108-109). Plaintiff also reported that he could be on

his feet for two to three hours before having to rest for an hour. (Tr. 109). Further, Plaintiff stated

that he could not work because he could not see well, would get weak fast, and could not stand long.

(Tr. 110).

At the December 3, 2002, hearing, Plaintiff testified that while he did not do a lot of

housework, he swept the floor a couple of times a week, cooked twice a week and mowed the yard

for 20 or 30 minutes at a time. (Tr. 43-44). Plaintiff stated that he had difficulty stand and walking

due to poor balance and could walk for about 15 minutes at a time. (Tr. 43-45). Plaintiff further

testified that he could sit for about 30 minutes without pain or numbness in his legs, had trouble

judging distances because of his limited vision, and could carry two or three sticks of wood at a

time. (Tr. 44-46).

In November 2004, Plaintiff reported that he rode his lawn mower 30 minutes at a time

during the summer, went grocery shopping once a week, vacuumed the floor once a week, and did

laundry. (Tr. 393). Plaintiff also reported that he no longer cooked using the stove and/or the oven, instead making sandwiches and microwave frozen meals. (Tr. 393). Plaintiff further reported that he walked around his yard everyday, visited his brother a couple of times a week, and listened to the radio all day. (Tr. 394-395). Additionally, Plaintiff stated that he could walk approximately 600 feet to the mailbox and back before needed to rest for ten minutes. (Tr. 396). Also, Plaintiff reported that he had difficulty lifting, squatting, bending, standing, walking, kneeling and stair climbing. (Tr. 396). Lastly, Plaintiff reported that he had back pain everyday and that medication slowed down the pain but did not relieve it. (Tr. 399).

At the February 1, 2006, hearing, Plaintiff testified that he was unable to write but could read printed material and was able to obtain a driver's license after several attempts. (Tr. 507). Plaintiff testified that he drove mainly to go to the doctors, which about 15-18 miles from his home, and did not socialize often. (Tr. 518-519). Plaintiff testified that he lived by himself and was able to perform daily chores for not more than an hour per day such as cleaning the dishes, sweeping the floor, doing laundry, grocery shopping, and picking up the yard. (Tr. 517-518). Plaintiff testified that his brother mows the yard for him during the summer. (Tr. 518). Additionally, Plaintiff stated that he smoked about a pack a day and drank a six-pack on the weekends. (Tr. 521). Additionally, Plaintiff testified that he became disabled in 2001 when he began having back and blood pressure problems and that he last worked on January 15, 2001. (Tr. 346, 511). Plaintiff further testified that his primary problem when he stopped working involved his back and leg pain as well as tolerating the chemicals on the job. (Tr. 512). He also complained of acid reflux, occasional abdominal pain, and an inability to see anything except light out of his right eye causing abnormal depth perception. (Tr. 512). Plaintiff further testified that he was unable to bend over, that it was difficult for him to

16

return to an upright position, keep his balance, lift over ten pounds, sleep, and climb stairs. (Tr. 512-513, 515). Also, Plaintiff stated that he had a constant pain of six to eight on a scale of one to ten and that pain medication relieved this paint to a level of three to four temporarily. (Tr. 513-514). Plaintiff estimated that he could sit for 30-40 minutes at a time, stand for one hour and walk for ten minutes. (Tr. 514-516). Additionally, Plaintiff testified that he spends 30 minutes, twice daily, four days out of the week lying down to help relieve his pain. (Tr. 515). The Plaintiff also testified that he had gout flare-ups every two to two and one-half months, lasting for three to seven days which made it difficult to walk. (Tr. 516).

      3.    *Vocational Expert Testimony*

On February 1, 2006, a vocational expert (VE), JoAnn Bullard, testified . (Tr. 521-528). Plaintiff has past relevant work as a material handler (heavy and semiskilled), shoe repairer (light and skilled), a janitor (medium and semiskilled), a jackhammer operator (heavy and unskilled), and a line erector (heavy and skilled). (Tr. 522-523). The VE found that Plaintiff was unable to return to these positions given his impairments and restrictions to light, unskilled work. (Tr. 527).

The ALJ posed a hypothetical, asking whether any work existed in the economy for an individual of Plaintiff's age, education, and prior relevant work experience perform who has demonstrated exertional impairments reflecting an RFC for a wide range of light work on a sustained basis with certain significant non-exertional impairments principally related to right-eye blindness, esophagus impairment, hypertension, spinal impairments, osteoarthritis, status post umbilical hernia residuals, right hip impairment, respiratory impairment, gout impairment and mental anxiety resulting a lack of an ocular vision, inability to handle excessive vibration, inability to perform frequent bending and stooping, inability to perform frequent squatting and a poor ability for reading

17

and writing. (Tr. 523-524). The VE stated that the following light, unskilled occupations were available: garment bagger with 5,517 positions in TN and 195,836 nationally, textile folder, with 7,756 positions in TN and 397,059 nationally, and silver wrapper with 1,817 positions in TN and 111,198 nationally. (Tr. 524). The VE further testified that a sit/stand option, an inability to work at heights, work around dangerous machinery, work around excessive dust, smoke, fumes and noxious gases, and an inability to learn or understand and carry out more simply job instructions would not effect the availability of these positions. (Tr. 525-526). Further, the VE testified that these positions would allow two short breaks per day, a long lunch break, and three absences per month. (Tr. 525-526). The VE then testified that if Plaintiff's impairments required him to lie down and rest outside of these breaks, he would be unable to maintain employment. (Tr. 526). Additionally, the VE stated that pain of a slight or moderate degree as well as fatigability of a slight or moderate degree would not affect the ability to maintain employment in these occupations but that pain of a moderately severe to a severe degree as well as fatigability of a moderately severe to a severe degree would lead to excessive absenteeism which would preclude employment. (Tr. 527).

The ALJ limited the hypothetical to sedentary work. (Tr. 524). The VE responded that sedentary occupations are usually very visually demanding, requiring much more vision than light occupations generally. (Tr. 524). The VE testified that Plaintiff's vision problems would preclude 99% of the sedentary occupations. (Tr. 525).

### III. CONCLUSIONS OF LAW

A.          <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The

18

purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B. <u>Proceedings at the Administrative Level</u>

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

(1)     If the claimant is working and the work constitutes substantial gain activity, benefits are automatically denied.

(2)     If the claimant is not found to have an impairment which significantly limits

his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[1] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5) Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the valuation process can be carried by relying on the medical vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's

---

[1]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423 (d)(2)(B).

### C. Plaintiff's Statement of Errors

Plaintiff alleges two errors in the ALJ's decision: (1) that the ALJ failed to give proper weight to the opinion of treating physician Dr. Trueman Smith as well as examining consultative physician, Dr. Blevins; and (2) that the ALJ improperly discounted Plaintiff's testimony as less than credible regarding the severity and persistence of his pain and symptoms. (Docket Entry 15, Page 13).

    1.    The ALJ failed to give the proper weight to the finding of Plaintiff's treating and examining consultative physicians.

An ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2). Further, even greater weight should be given to a physician's opinion if that physician has treated the claimant extensively or for a long period of time.

21

20 C.F.R. § 404.1527(d)(2)(I)-(ii). However, if there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (1994). While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is required to set forth some sufficient basis for rejecting these opinions. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). Additionally, it should be noted that a treating physician's statement that the claimant is "disabled" does not bind an ALJ as the definition of disability requires consideration of both medical and vocational factors. 20 C.F.R. § 404.1527(e)(1); *King v. Heckler*, 742 F.2d 968, 973 (1984).

The ALJ chose to discount the opinion of Dr. Smith, Plaintiff's treating physician, on two separate grounds: (1) that Dr. Smith's opinion was based on Plaintiff's subjective complaints of pain and his "apparent attempt to advocate for disability on behalf" of the Plaintiff and (2) that Dr. Smith's opinion was contradicted by the other medical evidence in the record, specifically, the opinions of treating physician Dr. Bremer as well as several non-examining state agency physicians. (Tr. 346-347). While the ALJ also discounted the opinion of Dr. Blevins, an examining consultative physician, the ALJ failed to provide any discussion as to why Dr. Blevins' opinion was also discounted, simply stating that, "...the undersigned is unconvinced of such restrictive limitations and is of the opinion that such limitations are due for the most part to the claimant's subjective complaints rather than based on the objective medical evidence in the record." (Tr. 346).

The undersigned finds that the ALJ did not afford the proper weight to Dr. Smith's or Dr. Blevins' opinions based upon the review of the entire record. The opinion of a non-examining physician is entitled to little weight if it is contrary to the opinion of claimant's treating physician.

22

*Shelman*, 821 F.2d at 321.  As such, the opinions of the non-examining state agency doctors do not provide a sufficient basis for rejecting the opinions of Plaintiff's treating physician.  Further, upon review of the record, it appears that Dr. Bremer, a gastroenterologist, had a very limited treating relationship in both length and scope, treating Plaintiff for Barrett's esophagus, not for the other impairments upon which Plaintiff's claim of disability is based.  (Tr. 208-209).[2]  Additionally, while the ALJ was convinced that both Dr. Smith and Dr. Blevins were basing their opinions on Plaintiff's subjective complaints of pain, such subjective complaints of pain or other symptoms may support a claim of disability.  *Blakenship v. Bowen*, 874 F.2d 1116, 1123 (6ᵗʰ Cir. 1989).

The record substantiates that Dr. Smith has routinely treated the Plaintiff, usually on a monthly basis, since April 2001 for all of his ailments.  Dr. Smith's treatment records reflect Plaintiff's chronic problems with back pain associated with osteoarthritis and degenerative disc disease, liver functions, hypertension and gout for which Dr. Smith has prescribed medication, issued referrals to specialists, and conducted laboratory testing. Throughout several years of treatment notes, Dr. Smith continuously reported Plaintiff's complaints of lower back pain, for which Dr. Smith has continuously prescribed Vicodin as treatment.  Additionally, Dr. Smith completed several medical assessments over a period of 4 years which continuously reflect Plaintiff's limitations based upon his long term treatment of the Plaintiff.[3]  Further, Dr. Blevins'

---

[2]The Magistrate Judge would further note that the opinions of Dr. Bremer and non-examining state agency Dr. Robinson do not even opine that Plaintiff has any visual impairment whatsoever when even the ALJ acknowledged that Plaintiff is blind in his right eye.  (Tr. 242, 456).

[3]The Commissioner makes a nonsensical argument that the form reports of Dr. Smith and Dr. Blevins should be entitled to less weight because the doctors only obligation was to check a box or fill in the blank.  (Docket Entry 18, Page 15).  This contrary to the law that a treating physician's opinion is entitled to substantial deference.  20 C.F.R. § 404.1527(d)(2). Further, if applied, uniform application would be required thus making it also an error for the ALJ to have

Case 2:06-cv-00094   Document 20   Filed 06/21/07   Page 23 of 28 PageID #: 98

consultative evaluation is not, contrary to the ALJ's assertion, based solely upon Plaintiff's subjective complaints of pain. Dr. Blevins conducted comprehensive range of motion testing and based his opinion on these test results as well as x-rays. As such, the ALJ provided no sufficient basis for rejecting the opinions of Dr. Smith and Dr. Blevins. *Shelman*, 821 F.2d at 321. Therefore, the ALJ improperly afforded less weight to Dr. Smith's and Dr. Blevins'opinions.

2.    The ALJ improperly discounted Plaintiff's subjective complaints of pain as well as the other medical evidence in the record regarding Plaintiff's pain.

An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997)(citing 42 U.S.C.A. § 423 and 20 C.F.R. §404.1529(a)). Further, discounting the credibility of a claimant is appropriate to a certain degree where the ALJ finds contradictions from medical reports, claimant's other testimony, and other evidence. *Id*.

There is a two-pronged standard for evaluating subjective complaints of disabling pain: (1) whether the objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). This test does not require objective evidence

---

relied so heavily upon the form reports of the non-examining state agency physicians as well as Dr. Bremer. The Magistrate Judge would also note that the form reports completed by Drs. Smith and Blevins included additional comments beyond the checked boxes whereas Dr. Bremer's form report, which was substantially relied upon by the ALJ, included none. (Tr. 240-243). Further, Dr. Blevins' report includes full range of motion results as well as x-rays. (Tr. 240-243). Simply stated, the Commissioner cannot supply forms to physicians to assist ALJs in making determinations and then argue that the opinions expressed in these forms should not be given any weight because of the format of the form itself.

24

of the pain itself. *Id*. The Sixth Circuit has found that: "The measure of an individual's pain cannot be easily reduced to a matter of neat calculations. There are no x-rays that can be taken that would objectively show the precise level of agony that an individual is experiencing." *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1369 (6th Cir. 1991). Therefore, the Secretary's own guidelines state that in cases where a claimant's pain suggests the possibility of greater restrictions of the individual's ability to function than can be demonstrated by objective medical evidence alone, reasonable conclusions as to any limitations on the individual's ability to do basic work activities can be derived from the consideration of other information in conjunction with objective medical evidence. *Id*. 20 C.F.R. § 404.1529. Other information includes, but is not limited to, the claimant's statements of symptoms; evidence submitted by treating, examining and/or consulting physicians; reported daily activities; the type, dosage, effectiveness, and side effects of any medication; and any measures, other than medication, used to relieve pain. 20 C.F.R. § 404.1529.

Here, the objective medical evidence, in the form of x-rays, revealed that Plaintiff suffered from degenerative lumbar disc disease, osteoarthritis of the lumbar spine, and acute and chronic lumbar strain. (Tr. 196, 274, 450). Further x-rays showed a decrease in normal joint space and early degenerative changes in the right hip. (Tr. 450). The ALJ found that while these impairments could reasonably be expected to produce the alleged symptoms, the Plaintiff's statements concerning the intensity, duration and limiting effects of these symptoms were not entirely credible.

Specifically, the ALJ found that Plaintiff's complaints of pain were not consistent with the objective medical data and were not fully credible because (1) the Plaintiff was not always compliant with his prescribed regimen of medications and (2) his ability to perform his reported daily activities was not consistent with his subjective complaints and reported limitations. (Tr. 349). After

25

reviewing this reasoning, the Magistrate Judge finds that the ALJ has not met the standard for evaluating the Plaintiff's subjective complaints of disabling pain, given that ALJ improperly discounted the opinions of Dr. Smith and Dr. Blevins. Further, the Magistrate Judge finds that it was an error for the ALJ to entirely discredit Plaintiff's own testimony as to the intensity, duration, and limiting effects of his pain.

The ALJ should have considered all other information in conjunction with the objective medical evidence, pursuant to 20 C.F.R. § 404.1529. Here, the ALJ did not do so, choosing to improperly discount Plaintiff's treating physician's opinion as well as the opinion of consultative examiner Dr. Blevins. The extensive treatment records from Dr. Smith show the persistence and severity of Plaintiff's pain, treated over several years on a Vicodin regimen. Moreover, over a period of several years and recorded in Dr. Smith's treatment notes, the Plaintiff is consistent in his complaints about pain, its nature and location, and the limitations it imposed on him. Further, these subjective complaints of pain or other symptoms may support a claim of disability. *Blakenship,* 874 F.2d at 1123.

Additionally, where there are no valid reasons for disbelieving a claimant's allegations of pain, such as where there are no inconsistencies or conflicting testimony regarding complaints to doctors with respect to pain, a finding of lack of credibility is not warranted. *Blakenship*, 874 F.2d at 1124. Again, the Plaintiff has been consistent, over a period of several years, when reporting to Dr. Smith the location, level, frequency, and duration of his pain, as well as the effect of the Vicodin treatment and his other measures used to relieve his pain. Therefore, the substantial evidence in the record is insufficient to support a rejection of Plaintiff's credibility regarding his symptoms.

3.      This case should be remanded with an award of benefits.

26

The VE testified that, if Plaintiff's testimony, which is consistent with Dr. Smith's opinion, is believed, Plaintiff would be unable to maintain employment. (Tr. 524-527). Furthermore, Dr. Blevins limited Plaintiff to less than full time light work, opining that Plaintiff could stand for two hours and sit for four hours in a workday. (Tr. 449). Additionally, the VE testified that sedentary occupations are usually very visually demanding, requiring much more vision than light occupations generally and that Plaintiff's vision problems would preclude 99% of the sedentary occupations. (Tr. 524-525). Therefore, the Magistrate Judge finds that the Secretary did not carry his burden of showing that Plaintiff possesses the RFC to perform substantial gainful activity.

If a court determines that substantial evidence does not support the Secretary's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. . .A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking. *Facuher v. Secretary of Health & Human Services*, 17 F.3d 171, 176 (6th Cir. 1994).

For the above stated reasons, the ALJ improperly discounted the opinions of treating physician Dr. Smith and examining consultative physician Dr. Blevins. Furthermore, the ALJ improperly discounted Plaintiff's subjective complaints. Upon review of the record and affording this testimony and these opinions their proper weight, the Magistrate Judge finds that there is a strong proof of disability and there is no significant evidence to the contrary. Consequently, the Magistrate Judge recommends that the District Judge remand for an award of benefits.[4]

_____

[4]The Magistrate Judge notes that the Plaintiff continues to consume beer and smoke against common sense and medical advice. The funds spent for these products could well be used to purchase the prescriptions he at times apparently decided to discontinue purchasing for lack of funds. Nevertheless, the disabling conditions described by Dr. Smith and Dr. Blevins

## IV.    RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that Plaintiff's Motion for Judgment on the Administrative Record be GRANTED, and that the decision of the Commissioner be REVERSED.  The Magistrate Judge recommends that this case be remanded to the Secretary for an award of benefits.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004 (en banc).

ENTERED this 21st day of June, 2007.


/S/ Joe B. Brown
_____
JOE B. BROWN
United States Magistrate Judge

---

relate to back pain and range of motion, not hypertension and gastric problems.